# EXHIBIT 1

COURT OF COMMON PLEAS
CUYAHOGA COUNTY

| | |
|---|---|
| DARCIE KANAGA, Individually and as the : Administrator of the Estate of Glenn Kanaga (deceased) 11562 Sunny Dr. Warrensville Heights, Ohio 44128 | Case No. JUDGE |
| *Plaintiff* | |
| *Vs.* | |
| | COMPLAINT |
| MONSANTO COMPANY, a corporation c/o Its Statutory Agent: CT Corporation System 1300 E. 9th St. Cleveland, Ohio 44114 | |
| | *JURY TRIAL DEMAND* |
| And | |
| DUNN HARDWARE, LLC. 5144 Wilson Mills Richmond Heights, Ohio | |
| And | |
| THE SCOTTS MIRACLE-GRO COMPANY c/o Its Statutory Agent: CT Corporation System 4400 Easton Commons Way, Suite 125 Columbus, Ohio 43219 | |
| And | |
| DOES (1- 100) inclusive, who may be responsible for Plaintiff's injuries but, despite due diligence, are unidentified at this time. | |
| *Defendants* | |

## COMPLAINT

Plaintiffs, The Estate of Glenn Kanaga and Darcie Kanaga ("Plaintiffs") by and through their undersigned attorneys, bring this Complaint for damages against Defendants' Monsanto Company, Dunn Hardware, LLC., The Scotts Miracle-Gro and Does 1-100.

## NATURE OF THE CASE

1.    This is an action for damages suffered by Plaintiffs as a direct and proximate cause of Defendants' negligent and wrongful conduct in connection with the design, development,  manufacture, testing, packaging, promotion, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

2.    "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed  Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

3.     Plaintiffs maintain that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.  Plaintiffs' injuries were avoidable.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to §2307 of the Ohio Revised Code.

## PARTIES

5.     Plaintiffs, the Estate of Glenn Kanaga and Darcie Kanaga are and at all relevant times were residents of Cuyahoga County, Ohio.

6.     Darcie Kanaga is the duly Executrix of the Estate of Glenn Kanaga, having been appointed by the Cuyahoga County Probate Court.

7.      Plaintiff, the Estate of Glenn Kanaga (hereinafter referred to as "Kanaga") brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate cause of being exposed to Roundup, Kanaga developed lymphoma. (hereinafter known as "lymphoma").

8.     Defendant Monsanto Company (hereafter referred to as "Monsanto") is a Delaware corporation, which is licensed to do business in Ohio, with a principle place of business in St. Louis,  Missouri.

9.     Defendant Scotts Miracle-Gro is an Ohio Corporation headquartered in Marysville, Ohio and was the exclusive marketer and distributor for Monsanto's consumer Roundup Products in Ohio.

10.    Dunn Hardware LLC, ("Dunn Hardware") advertised and sold goods, specifically Roundup, in Cuyahoga County, Ohio and was the place where Kanaga purchased Roundup.

11.    Dunn Hardware derived substantial revenue from goods and products used in the State of Ohio.

12.     Dunn Hardware and The Scotts Miracle-Gro Company, expected or should have expected their acts to have consequences within the State of Ohio, and derived substantial revenue from interstate commerce.

13.     Dunn Hardware is a corporation authorized to do business in the state of Ohio and derives substantial income from doing business in this state.

14.     The Scotts Miracle-Gro Company ("Scotts Miracle-Gro"), is an Ohio Corporation authorized to do business in the state of Ohio and derives substantial income from doing business in the state of Ohio.

15.     Upon information and belief, Dunn Hardware and Scotts Miracle-Gro purposefully availed themselves of the privilege of conducting activities within the State of Ohio, thus invoking the benefits and protections of its laws.

16.     Upon information and belief, Dunn Hardware and Scotts Miracle-Gro did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

17.     Plaintiffs had resided in Warrensville Heights, Ohio, until Glenn Kanaga's death. Darcie Kanaga at all times herein resided in Warrensville Heights, Ohio.

18.     Glenn Kanaga, (deceased) (hereinafter known to as "Kanaga") resided in Mentor, Ohio, at the time of his original diagnosis of lymphoma in 1984.

19.     Kanaga received medical treatment for his lymphoma at Lake County Memorial Hospital, and also subsequently at Cleveland Clinic in Cleveland, Ohio.

20.     Kanaga alleges injury from his exposure to Defendants' Roundup products.

21.     Kanaga was first exposed to Monsanto's Roundup products from approximately 1980 to 1984.  Kanaga sprayed Roundup for schools while employed at the Lake County Grounds Department.  Kanaga cut grass, pulled weeds and sprayed Roundup throughout his employment with Lake County Grounds Department commencing in Spring through Fall and each subsequent

season through 1984.

22.    Kanaga was first diagnosed with lymphoma in 1984, and after being diagnosed with lymphoma was subjected to extensive radiation and chemotherapy treatments which resulted in damage to multiple organ systems, including the removal of his spleen and significant heart damage which resulted in severe pain and suffering and was a proximate cause of his death.

23.    Kanaga then started Kanaga Landscaping unaware that Roundup had caused his injuries. Plaintiff continued to cut grass, pull weeds, mix and spray significant amounts of Roundup for his clients from 1987 to 2015.

24.    Kanaga also worked at Hathaway Brown High School cutting grass, pulling weeds and spraying Roundup from 1996 to 2008.

25.    Kanaga had extensive exposure to Roundup through Lake County Building and Grounds at Andrews Academy from 2008 to 2014.

26.    On April 18th, 2007, Kanaga had quadruple bypass that his physicians opined was another sequelae of treatment for lymphoma.

27.    In 2014, Kanaga had Coronary Artery Bypass Graft and a heart valve was replaced with a cow valve which was directly caused by the Roundup related cancer, radiation treatments, and its sequelae.

28.    In July 2018, Kanaga, developed acute pulmonary inflammation and was treated for 33 days in the hospital and developed chronic pulmonary obstructions of which were proximately caused by Roundup exposure, cancer, radiation and its sequelae.

29.    For the final 6 years of his life Kanaga was immunologically compromised and was spending considerable time in hospitals with multiple organ system failures, until his wrongful death on November 15, 2024.

30.     Kanaga has an identical twin who has never been exposed to Roundup and has never had a medical problem nor has he ever been diagnosed with any related disease.

31.     As a direct and proximate cause of the negligence of Defendants and its agents and/or employees, Kanaga sustained a permanent and substantial physical deformity and permanent injuries.

32.     Since 2004, Darcie Kanaga has been the spouse of Glenn Kanaga and brings a loss of consortium claim.

33.     The Plaintiffs bring these claims against Monsanto under the following theories of liability: strict liability, design defect; failure to warn; negligence; breach of express warranty; breach of implied warranties and all causes of action pursuant to §2307.70 to §2307.801 of the Ohio Revised Code.

34.     Upon information and belief, Defendants DOES 1-100 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate despite the exercise of due diligence.  The identities of DOES 1-100 are unknown to Plaintiffs at this time.   Plaintiffs will move the Court to specifically name DOES 1- 100 as their identities becomes known to Plaintiff through discovery.

35.     Defendants Monsanto, Scotts Miracle-Gro, Dunn Hardware and DOES 1 through 100 are collectively referred to as "Defendants."

## FACTUAL ALLEGATIONS

36.     At all relevant times, the Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised,

6

promoted, marketed, sold, and distributed the commercial herbicide Roundup.

37.     Monsanto and Scotts Miracle-Gro are multinational agricultural biotechnology corporations, Monsanto is based in St. Louis, Missouri and Scotts Miracle-Grow is based in Marysville, Ohio and together were the world's leading producer and distributor of glyphosate.

38.     Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

39.     Glyphosate is the active ingredient in Roundup.

40.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

41.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

42.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

43.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

44.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, educational facilities, campuses, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

45.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

46.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

47.     For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

48.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

49.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

50.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

51.     The EPA and the State of Ohio registered Roundup for distribution, sale, and manufacture in the United States and the State of Ohio.

52.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

53.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

54.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

55.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

> a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways,

sidewalks and fences ...

b)  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)  Roundup biodegrades into naturally occurring elements.

d)  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)  You can apply Accord with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

56.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    c) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

***

    d) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

***

    e) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

***

    f) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

***

    g) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    h) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

57.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

58.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety

11

of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

59. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

60. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

61. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

62. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non- carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

63. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that Roundup formulations were significantly more toxic than glyphosate alone.[8]

64.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

65.    The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

66.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

67.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells." [9]

68.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

69.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between

---

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.

[8] Martinez et al 1991.

[9] (Molinari, 2000; Stewart et al., 2003)

glyphosate and Roundup formulation products.

70.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

71.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

72.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

73.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

74.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

75.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

76.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiffs and the consuming public.

77.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

78.     The International Agency for Research on Cancer ("IARC") is the specialized

14

intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

79.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

80.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data  reviewed is sourced preferably from publicly accessible, peer-reviewed data.

81.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

82.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

83.     The IARC Working Group found an increased risk between exposure to glyphosate and

non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

84. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

85. Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

86. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

87. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

88. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

89. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

90. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

91. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

92. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

93. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

94. The IARC Monograph reflects the volume of evidence of glyphosate pesticides'

genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

95.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

96.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

97.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, related lymphomas, multiple myeloma, and soft tissue sarcoma.

98.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

99.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

100.   In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

101.   The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

102.   In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

103.   The study, which controlled potential confounders, found a relationship between increased NHL incidence and glyphosate.

104.   In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

105.   This strengthened previous associations between glyphosate and NHL.

106.   In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

107.   Upon information and belief, these statements and representations have been made with the intent of inducing Kanaga, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Kanaga to use Roundup.

108.   Defendants made these statements with complete disregard and reckless indifference to the safety of Kanaga and the general public.

109.   Notwithstanding Defendants' representations, scientific evidence has established a  clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL related lymphomas, Multiple Myeloma, and soft tissue sarcoma.

110.   Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, related lymphomas, Multiple Myeloma, and soft tissue sarcomas.

111.   Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL and related lymphomas as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

112.   Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies  agree  that  there  is  no  evidence  of  carcinogenicity  or  genotoxicity  in

glyphosate and Roundup.

113. Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

114. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

115. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

116. Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

117. Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiffs.

118. Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

119. Defendants' failure to adequately warn Kanaga resulted in (1) Kanaga using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, related lymphomas, and other injuries associated with Roundup.

120. Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

121.   The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

122.   The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

123.   The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

124.   By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Kanaga's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Kanaga to suffer from cancer, specifically related lymphomas and Kanaga suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and death.

125.   By reason of the foregoing, Kanaga was severely and permanently injured in the course of his life.

126.   By reason of the foregoing acts and omissions, Kanaga had endured and, in some categories continued to suffer until his death, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

127.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully restated herein.

128.   The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.[11] Indeed,  even as of October 2015, Defendants continue to represent to the public

---

[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added)

129.   As a result of Defendants' actions, Kanaga was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Kanaga to the risks alleged herein and that the injuries incurred by Kanaga were a direct and proximate result of Defendants' acts, omissions and failure to warn.

130.   Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiffs. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

131.   Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**FIRST CAUSE OF ACTION: NEGLIGENCE AND VIOLATIONS OF**

**R.C. CHAPTER 2307.**

132.  Plaintiffs repeat, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

133.  Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

134.  Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL or related lymphomas as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

135.  The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

      a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

      b.   Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

      c.   Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

      d.   Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.    Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.    Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.    Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.    Negligently designing Roundup in a manner, which was dangerous to its users;

m.    Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.    Negligently producing Roundup in a manner, which was dangerous to its users;

o.    Negligently formulating Roundup in a manner, which was dangerous to its users;

p.    Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q.    Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r.    Negligently selling Roundup with a false and misleading label.

136.  Defendants under-reported, underestimated, and downplayed the serious dangers of

23

Roundup.

137.    Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

138.    Defendants were negligent and/or violated Ohio law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

> a.    Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;
>
> b.    Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;
>
> c.    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;
>
> d.    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;
>
> e.    Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL or HL;
>
> f.    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;
>
> g.    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;
>
> h.    Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;
>
> i.    Were otherwise careless and/or negligent.

139.    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiffs herein.

140.    Defendants knew or should have known that consumers such as Plaintiff would

foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

141.    Defendants' violations of law and/or negligence was the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiff suffered and which was the proximate cause of his death.

142.    As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL or related lymphomas, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Kanaga suffered life- threatening NHL or related lymphomas and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

143.    WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demands a  jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

144.    Plaintiffs re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if restated herein.

145.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by Kanaga.

146.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in

which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

147.   At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Kanaga.  The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

148.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, in normal use, and it was more dangerous than an ordinary consumer would expect.

149.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

   a.   When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

   b.   When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

   c.   When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

   d.   Defendants did not sufficiently test, investigate, or study its Roundup products.

   e.   Exposure to Roundup presents a risk of harmful side effects that outweigh any

26

potential utility stemming from the use of the herbicide.

    f.  Defendants knew or should have known at the time of marketing its Roundup products, that exposure to Roundup could result in cancer and other severe illnesses and injuries.

    g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

150.  Defendants knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

151.  Kanaga was exposed to Defendants' Roundup in the course of his employment, as described above, without knowledge of Roundup's dangerous characteristics.

152.  At the time of Kanaga's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

153.  Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, Kanaga.

154.  Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

155.  Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

156.  Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

157.  Roundup was designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants and was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

158.  Roundup was designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants when it reached their intended users in the same

defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

159.  Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Kanaga in particular, and Defendants are therefore strictly liable for the injuries sustained by Kanaga.

160.  Kanaga could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

161.  By reason of the foregoing, the Defendants have become strictly liable to Kanaga for the manufacture, marketing, promotion, distribution, and selling of a defective product, to wit: Roundup. Defendants' defective design of Roundup amounts to the willful, wanton, and/or reckless conduct by Defendants.

162.  Defects in Defendants' Roundup were a proximate cause of Plaintiffs' injuries and death.

163.  As a result of the foregoing acts and omission, Kanaga developed a related lymphoma, and suffered severe and personal injuries, which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care and which ultimately resulted in Decedent's wrongful death.

164.  WHEREFORE, Kanaga respectfully requests that this Court enter judgment in Kanaga's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief that this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

165.  Plaintiffs re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect restated herein.

166.  Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have

knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

167. Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiffs. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

168. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

169. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Kanaga was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing lymphoma as a result of exposure and use.

170. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E) and R.C. §2307.76

171. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Ohio, including but not limited to R.C. §2307.76.

172. Defendants could have amended the label of Roundup to provide additional warnings.

173. This defect caused serious injury to Kanaga, who used Roundup in its intended and foreseeable manner.

174.  At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply,  provide proper warnings,  and take such steps to assure that  the  product did  not  cause users to suffer from unreasonable and dangerous side effects.

175.  Defendants labeled, distributed, and promoted the aforesaid product without warning that it was dangerous and unsafe for the use and purpose for which it was intended.

176.  Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of lymhoma.

177.  Defendants were aware of the probable consequences of the aforesaid conduct. Despite the  fact that Defendants knew or  should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic  properties and side effect of developing Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in  doing so, Defendants acted with a conscious disregard for the safety of Kanaga.

178.  At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup prior to sustaining injuries and death through the exercise of reasonable care.

179.  Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

180.  Kanaga  reasonably  relied  upon  the  skill,  superior  knowledge,  and  judgment  of Defendants.

181.  Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of lymphoma by not using Roundup.

182.  The information that Defendants did provide or communicate, failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to  utilize the product safely and with adequate protection. Instead, Defendants disseminated

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

183.   To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

184.   As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when Roundup left the possession and/or control of Defendants, were distributed by Defendant, and used by Kanaga.

185.   As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Kanaga to sustain injuries a n d d e a t h as herein alleged.

186.   WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

187.   Plaintiffs re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully restated herein.

188.   At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compounded portrayed, distributed,

recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

189. At the time Defendants marketed, sold, and distributed Roundup for use by Kanaga, Defendants knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for its intended use.

190. The Defendants impliedly represented and warranted to Kanaga and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

191. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

192. Kanaga and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

193. Kanaga reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

194. Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

195. The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

196. As a result of the foregoing acts and omissions, Kanaga suffered from Hodgkins lymphoma and/or related lymphoma and Kanaga suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished

enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages which lasted until Decedent's death.

197.    WHEREFORE, Kanaga respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demands a jury trial on all issues contained herein.

### FIFTH CAUSE OF ACTION
### <u>FRAUD</u>

198.    Plaintiffs re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully restated herein.

199.    Defendant Monsanto has defrauded the public, including Kanaga, by misrepresenting and/or concealing facts, by failing to disclose the Roundup products known risks of cancer.

200.    Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite ("AMPA") could cause cancer: glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic acids within the human gut, leading to downstream health conditions, including cancer; exposure to glyphosate and AMPA is causally associated with NHL and related lymphomas; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

201.    Kanaga relied on these material misrepresentations regarding the safety of Roundup and its active ingredient glyphosate. In deciding whether to purchase and/or use the product, Plaintiff did not know nor could Kanaga have reasonably known of the misrepresentation and/or material omissions by defendant concerning Roundup and its active ingredient glyphosate.

202. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

203. When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public, including the Plaintiff and with the intent of inducing the public to purchase and use Roundup®.

204. Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Kanaga and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendants' deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendants are liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

205. As a proximate result of Defendants' fraudulent and deceitful conduct and representations, Kanaga has sustained damages and other losses in an amount to be proven at trial.

206. As a proximate result of Defendants' fraud, as alleged herein, Kanaga sustained a loss of income and loss of earning capacity, including lost income.

**SIXTH CAUSE OF ACTION**
**CLAIMS AGAINST DUNN HARDWARE LLC ND SCOTT MIRCILE GRO**

207. Plaintiffs re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully restated herein.

208. Dunn and Scotts Miracle-Gro were suppliers of the Roundup product pursuant to O.R.C.§ 2307.71 (A) (15)(a)(i)(ii), as during its business it sold, distributed, leased, prepared, blended, supplied, packaged, labeled, or otherwise participated in the placing of a defective product in the stream of commerce.

209. Kanaga purchased the Roundup from Dunn Hardware, which was distributed by the exclusive, distributor in Ohio, Scotts Miracle-Gro, which subsequently was the proximate cause of Decedent's injuries and death. Pursuant to Chapter 2307, Dunn, Scotts Miracle-Gro, along with Monsanto, are jointly and severally responsible for Decedent's injuries and death.

**SEVENTH CAUSE OF ACTION**
**WRONGFUL DEATH CLAIM AGAINST DEFENDANTS**

210. Plaintiffs re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully restated herein.

211. The Plaintiffs bring this action for wrongful death pursuant to Chapter 2125 of the Ohio Revised Code, for the benefit of the next of kin.

212. The Defendants and all those entities whose negligence, or wanton misconduct, or other wrongful conduct contributed to the death of Kanaga, whether the singular or plural, that person or those persons who were employees or executive officers of Monsanto, who had been delegated responsibility by their employer to provide a safe product to the public or those entities, who or which conducted safety inspections or analysis of the Roundup product with regard to what was being sold, or those persons or entities who were involved in planning in any way for the

distribution of the Roundup product, are responsible and are the proximate cause of the death of Kanaga.

213.    Dunn Hardware, and Scotts Miracle-Gro are part of the distribution chain for the Roundup product whose distribution, preparation, supply, packaging, labeling, or otherwise participated in the placing of the defective Roundup product in the stream of commerce, is a proximate cause of the injuries and death of Kanaga.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, wrongful death and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and  deter future similar conduct, to the extent allowed by applicable law;

5.    Funeral costs and autopsy;

6.      Pre-judgment interest;

7.      Post-judgment interest;

8.      Awarding Plaintiffs reasonable attorneys' fees;

9.      Awarding Plaintiffs the costs of these proceedings; and

10.     Such other and further relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.


Respectfully submitted

*/s/ William A. Carlin*
WILLIAM A. CARLIN (0009144)
29325 Chagrin Blvd., Suite 305
Pepper Pike, Ohio 44122
Tel:  216/831-4935; Fax:  216/831-9526
wcarlinesq@aol.com
&
William P. Smith (0084956)
William P. Smith Legal Services LLC
Phone (216) 789-1978; Fax (216) 831-9526
Email: attorneywilliamSmith@yahoo.com


## CERTIFICATE OF SERVICE

I hereby certify that, on December 9th, 2025, a copy of said Complaint was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.


*/s/ William A. Carlin*
WILLIAM A. CARLIN (0009144)

## CASE INFORMATION

**CV-25-129465 DARCIE KANAGA, ET AL vs. MONSANTO COMPANY, ET AL.**

View Printer Friendly Version

### Docket Information

| From Filing Date | | Docket Type 1 | Docket Type 2 | Docket Type 3 | Docket Type 4 | Filter Results | |
|---|---|---|---|---|---|---|---|
| / / 🌐 | | [SELECT ▾] | [SELECT ▾] | [SELECT ▾] | [SELECT ▾] | Start Search | 🌐 |

| Filing Date | Docket Party | Docket Type | Docket Description | View Image |
|---|---|---|---|---|
| 12/17/2025 | N/A | SR | CERTIFIED MAIL RECEIPT NO. 58955006 RETURNED 12/16/2025 FAILURE OF SERVICE ON DEFENDANT MONSANTO COMPANY, A CORPORATION - UNABLE TO FORWARD NOTICE MAILED TO PLAINTIFF(S) ATTORNEY | |
| 12/11/2025 | D3 | SR | SUMS COMPLAINT(58955008) SENT BY CERTIFIED MAIL. TO: THE SCOTTS MIRACLE-GRO COMPANY 4400 EAST COMMON WAY SUITE 125 COLUMBUS, OH 43219 | 📄 |
| 12/11/2025 | D2 | SR | SUMS COMPLAINT(58955007) SENT BY CERTIFIED MAIL. TO: DUNN HARDWARE, LLC 5144 WILSON MILLS RICHMOND HEIGHTS, OH 44143 | 📄 |
| 12/11/2025 | D1 | SR | SUMS COMPLAINT(58955006) SENT BY CERTIFIED MAIL. TO: MONSANTO COMPANY, A CORPORATION 1300 E. 9TH ST CLEVELAND, OH 44114 | 📄 |
| 12/10/2025 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 12/10/2025 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 12/10/2025 | N/A | SR | SUMMONS E-FILE COPY COST | |
| 12/10/2025 | D3 | CS | WRIT FEE | |
| 12/10/2025 | D2 | CS | WRIT FEE | |
| 12/10/2025 | D1 | CS | WRIT FEE | |
| 12/09/2025 | N/A | SF | JUDGE JOHN P O'DONNELL ASSIGNED (RANDOM) | |
| 12/09/2025 | P1 | SF | LEGAL RESEARCH | |
| 12/09/2025 | P1 | SF | LEGAL NEWS | |

| 12/09/2025 | P1 | SF | LEGAL AID |
| 12/09/2025 | P1 | SF | COURT SPECIAL PROJECTS FUND |
| 12/09/2025 | P1 | SF | COMPUTER FEE |
| 12/09/2025 | P1 | SF | CLERK'S FEE |
| 12/09/2025 | P1 | SF | DEPOSIT AMOUNT PAID WILLIAM A CARLIN |
| 12/09/2025 | N/A | SF | CASE FILED: COMPLAINT |

Only the official court records available from the Cuyahoga County Clerk of Courts, available in person, should be relied upon as accurate and current.
Website Questions or Comments.
Copyright © 2025 PROWARE. All Rights Reserved. 1.1.303